**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 17, 2020[*]
Decided September 24, 2020

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-2933

| | |
|---|---|
| TOM TUDUJ, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of Illinois. |
| | |
| *v.* | No. 3:17-cv-00219-NJR-GCS |
| | |
| FRANK LAWRENCE, *et al.*, | Nancy J. Rosenstengel, |
| *Defendants-Appellees.* | *Chief Judge*. |

## O R D E R

Tom Tuduj asserts that prison doctors violated the Eighth Amendment by not providing him with adequate medical care for three conditions: migraine headaches, light sensitivity, and skin rashes. *See* 42 U.S.C. § 1983. The district court entered summary judgment for defendants. Because Tuduj failed to offer evidence that the defendants were deliberately indifferent to these medical needs, we affirm.

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

This case stretches back to 2009 when Tuduj transferred to Menard Correctional Center in Chester, Illinois. According to Tuduj, in whose favor we construe the evidence and draw all reasonable inferences, *see Bridges v. Dart*, 950 F.3d 476, 478 (7th Cir. 2020), for about eight years he has complained to medical staff about migraines, photophobia (light sensitivity), and skin rashes. He attributes all three symptoms to a self-diagnosed disease—an infection of the shingles (or varicella-zoster) virus.

We begin with his first two symptoms, headaches and photophobia, which Tuduj told medical staff about soon after he arrived at Menard. Dr. Samuel Nwaobasi evaluated him first and prescribed Motrin for his headaches. Months later, a nurse practitioner saw him for his headaches and light sensitivity. She saw no obvious issue with Tuduj's eyes but continued the Motrin for his headaches. A year later, another doctor evaluated Tuduj for eye pain from exposure to light. The doctor could not give Tuduj the sunglasses that he wanted but referred him to Menard's optometry clinic.

Over the next five years, Menard's optometrists saw Tuduj often for his eye pain and provided treatment. A doctor prescribed reading glasses for him in late 2011. A few months later, another doctor prescribed a pair of transition lenses (eyeglass lenses that darken with increasing light). After receiving those lenses, Tuduj showed no signs of photophobia in early 2013. Five months later, when Tuduj complained of extreme photophobia, the examining doctor found no ocular reason for Tuduj's pain. In 2015, Tuduj complained that his transition lenses were no longer darkening enough to relieve his pain. An optometrist assessed Tuduj with Scotoma Syndrome (an area of diminished visual acuity) and asked a review board to consider providing him with new transition lenses or rubber sunglasses. Dr. Stephen Ritz denied the request for rubber sunglasses. (Review board approval was not needed for transition lenses.) He concluded that the sunglasses were not needed to treat diminished visual acuity or complaints of discomfort from light, given the lack of any ocular defects. Two months later, after Tuduj complained again that his transition lenses still did not darken enough, he received post-operative sunglasses. (Tuduj does not say that these were less useful than rubber sunglasses). Finally, in late 2016, Tuduj saw a doctor who asked Menard's acting medical director to consider referring Tuduj to an ophthalmologist. The record contains no complaints from Tuduj about his eye treatment afterward.

The events regarding Tuduj's skin treatment begin in 2011, when he complained of cold sores. A doctor noted that his lips were red and swollen, assessed him with a

cold sore and cellulitis of the lips, and prescribed two oral drugs and a triple antibiotic ointment. Tuduj reported two weeks later that his condition had improved. Three years later, he returned to the health care unit to complain of renewed cold sores and rashes, which he attributed to the shingles virus. Dr. Nwaobasi diagnosed Tuduj with recurrent cold sores and prescribed a hydrogen peroxide serum. Later, Tuduj asked for the compound dimethyl sulfoxide to treat the "breakouts" on his face and lips. A doctor prescribed the compound for one month, but she later discontinued it because it is FDA approved for interstitial cystitis; she instead prescribed a triple antibiotic ointment. Twice in 2015 Tuduj again asked for the dimethyl sulfoxide to treat the rashes that he associated with shingles, but a prison doctor, observing no rashes, advised him that it was unnecessary and that the pharmacy would not fill a prescription for it. A nurse found no rashes on Tuduj in late 2015. No complaints occurred thereafter.

This deliberate-indifference suit came next. In early rulings, the district court twice allowed Tuduj to amend his complaint and to add as a new defendant the employer of the medical staff, Wexford Health Sources. It also dismissed some defendants. The remaining defendants—the warden, four treating doctors, and Wexford—moved for summary judgment. They argued that the medical evidence established that Tuduj did not have shingles, and if he did, they were not deliberately indifferent to it. Tuduj responded that he does have singles, it is objectively serious, and the defendants failed to diagnose it or treat it with the compound (dimethyl sulfoxide), which he believes will cure it. Further, Tuduj asserted, Wexford had a policy of not allowing inmates to have sunglasses, which he contended left his eye condition recklessly untreated.

Procedural skirmishes occurred after Tuduj responded to the motion for summary judgment. First, the court considered Tuduj's request to amend his complaint (for a third time) to add more defendants, and it ruled that his request was untimely. Second, Tuduj served requests for admissions (asking defendants to admit certain facts that Tuduj mentioned in his response to their motion for summary judgment), which the court struck as also untimely. Third, Dr. Nwaobasi died. In response, Tuduj sought leave to substitute Dr. Nwaobasi's insurer as a defendant, but then moved to dismiss the doctor voluntarily. Consequently, the court ruled that his request to substitute the insurer as a party was moot and dismissed the claim against Dr. Nwaobasi with prejudice. Finally, Tuduj again sought to add new defendants; the court repeated that

the request was untimely but advised him that he might be able to pursue them in another suit.

The district court entered summary judgment against Tuduj. It ruled that he could not establish an objectively serious medical condition because no doctor had diagnosed him with shingles. Alternatively, Tuduj could not show that defendants were deliberately indifferent because they adequately treated him.

On appeal, Tuduj first contests the rulings on the motions that he filed after the defendants moved for summary judgment. We begin with the denials of his requests to amend his complaint a third time (to add more defendants) and the discovery ruling striking his requests to admit, all of which we review for abuse of discretion. *See Divane v. Northwestern Univ.*, 953 F.3d 980, 993 (7th Cir. 2020); *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013). Tuduj has not articulated why he could not have asked to add the new defendants to his second amended complaint. Nor does he adequately explain why he could not have served his requests to admit before he filed his response to the motion for summary judgment, given that his response mentions the facts that he later wanted admitted. Without those explanations, the district court reasonably denied his requests as untimely. *See, e.g., Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004). Tuduj also contests the dismissal of Dr. Nwaobasi while his request for substitution was pending. But he moved to dismiss the doctor voluntarily, so the district court did not abuse its discretion in doing so. *See* FED. R. CIV. P. 41(a)(2).

That brings us to the merits. Tuduj first argues that the district court erred in ruling that he failed to proffer evidence that migraines, photophobia, and rashes are not objectively serious. We need not reach this issue because, to withstand summary judgment, Tuduj also needs to show that the defendants knew about his conditions yet deliberately withheld treatment. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). But the undisputed evidence is that, beginning in 2009, the medical staff evaluated and treated him often to alleviate his symptoms. They gave him pain reliever for his migraines; reading glasses, transition lenses, and post-operative sunglasses for his photophobia (even though he has no ocular defects); and oral drugs and topical ointments for his skin. This customized care complies with the Eighth Amendment.

Tuduj has two responses, but neither persuades us. First, he contends that his doctors were deliberately indifferent because they did not prescribe dimethyl sulfoxide, which Tuduj believes would cure his self-diagnosed shingles infection and vanquish his symptoms. But the Eighth Amendment does not entitle an inmate to specific treatment. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Because no doctor ever diagnosed Tuduj with shingles, the decision to deny Tuduj's request for dimethyl sulfoxide to treat that virus was not "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Second, Tuduj argues that Dr. Ritz's decision to deny him a prescription for rubber sunglasses reflects deliberate indifference. But without contradiction, Dr. Ritz explained that sunglasses are unnecessary to treat Scotoma Syndrome or complaints about light from a patient who does not have ocular issues. Without evidence disputing the legitimacy of this rationale, a jury could not reasonably find that Dr. Ritz was deliberately indifferent to Tuduj's medical needs. *See id*.

We end by briefly addressing Tuduj's two final claims. First, his claim against Wexford fails. Institutional liability is possible under the *Monell* doctrine where a municipal or here, by extension, an institutional policy both reflects deliberate indifference to an inmate's serious medical needs and causes a constitutional injury. *See e.g.*, *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc). But Wexford's alleged "policy" of not prescribing sunglasses did not harm Tuduj because, as just mentioned, he had no medical need for sunglasses and in any event he received post-operative sunglasses, which he does not contend were less helpful than rubber sunglasses. Second, his official-capacity claim against the warden fails. Tuduj did not mention it in his opening brief or argue that he was entitled to relief or a trial against the warden. He has thus waived any challenge to the ruling in the warden's favor. *See Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020).

We have considered Tuduj's remaining arguments, and none has merit.

AFFIRMED